# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4002 | **DATE** | 2/13/2002 |
| **CASE TITLE** | Jaime A. Dorado vs. Aargus Security Systems, Inc. and Lincoln Property Company Commercial, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 3/21/2002 at 9:30 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant Lincoln Property Company Commercial, Inc.'s motion [27-1] to dismiss Count II of the amended complaint is granted without prejudice. If no amended complaint is filed within thirty (30) days, this dismissal will be with prejudice. A status hearing is set for 9:30 A.M. on March 21, 2002.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | FEB 14 2002 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | 35 |
| | Mail AO 450 form. | | docketing deputy initials |
| | Copy to judge/magistrate judge. | 02 FEB 14 PM 12:50 | |
| Ro/en courtroom deputy's initials | | FILED-ED 10 Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAIME A. DORADO, | ) |
| | ) |
| Plaintiff, | ) Case No. 00 C 4002 |
| v. | ) |
| | ) |
| AARGUS SECURITY SYSTEMS, INC. and | ) |
| LINCOLN PROPERTY COMPANY | ) Judge Joan B. Gottschall |
| COMMERCIAL, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This motion raises two important issues affecting many federal civil rights plaintiffs who also raise state-law claims. To avoid dismissal here, the plaintiff must successfully navigate between the Scylla of federal labor law and the Charybdis of state anti-discrimination law. The plaintiff avoids the monster but not the whirlpool. Accordingly, the motion to dismiss is granted.

### I. Background[1]

The plaintiff, Jaime Dorado, is a black man. From February 7, 1991 until March 6, 2000, Dorado was employed as a Site Supervisor of the same building in downtown Chicago. Defendant Lincoln Property Company Commercial, Inc. ("Lincoln") took over property management of the building in March 1997. In June of the same year, defendant Aargus Security Systems, Inc. ("Aargus") took over security management and employed Dorado under a union contract.

---

[1] For the purposes of this motion, the court assumes the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001).

During his employment, Dorado developed a personal, romantic relationship with a white female employee of one of the building tenants. In August 1997, Sherri Green, who is Lincoln's agent, began to make derogatory and racially based comments to Dorado regarding the relationship and to prepare adverse disciplinary reports on Dorado. Also in August, Green informed Dorado that he would no longer be allowed to leave his post during his nine hour shift. Dorado was unable to comply due to a kidney condition, and he took washroom and lunch breaks when he could find someone else to fill his post. Green filed disciplinary reports when she discovered those breaks. Lincoln and Aargus ignored Dorado's complaints as to both the racial harassment and the elimination of breaks.

In July 1999, after Dorado filed a union grievance, his lunch and daily breaks were reinstated, but the racial and disability discrimination continued. Dorado filed EEOC complaints, which he withdrew and released in a December 1999 settlement in exchange for Lincoln's and Aargus's agreement to continue Dorado's employment, to expunge the disciplinary reports, and to cease further harassment.

In February 2000, Dorado made his annual request for vacation pay in lieu of vacation time, which in past years had been immediately granted. Dorado needed the money to cover medical expenses. After Aargus ignored additional reminders and requests, Dorado sought a short-term loan from a friend who was also a tenant of the building. Green discovered the loan, reported it to Aargus, and asked Aargus to fire Dorado. On March 6, 2000, Aargus terminated Dorado for requesting the loan; the vacation pay arrived a week later; and, on March 15, Dorado filed charges with the EEOC claiming that he was discharged in retaliation for filing the earlier discrimination charges. On April 5, 2000, the EEOC issued a right to sue letter, and Dorado filed

this action on March 19, 2001. His amended complaint charges Aargus with race and disability discrimination and Lincoln with tortious interference with prospective economic advantage and contract. Lincoln has moved to dismiss the second count for failure to state a claim on which relief may be granted. Fed. R. Civ. P. 12(b)(6).

## II. Analysis

On a Rule 12(b)(6) motion, dismissal is proper only if the plaintiff could prove no set of facts, consistent with the complaint, that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Veazey v. Communications & Cable, Inc.*, 194 F.3d 850, 854 (7th Cir. 1999).

### A. Labor-Management Relations Act

Lincoln argues that Dorado's tortious interference claims are preempted by section 301(a) of the Labor Management Relations Act, 29 U.S.C.A. § 185(a) (West 1998). Because Dorado's claims are independent of the collective bargaining agreement, this argument fails.

Section 301(a) provides for federal court jurisdiction over suits for violations of labor contracts. *Id.* The United States Supreme Court has held that section 301 also "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 451 n.2 (1957). Although state courts have concurrent jurisdiction over section 301 claims, *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502 (1962), federal law alone governs the interpretation of labor contracts, *Local 174, Teamsters of Am. v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962). As the Court explained, "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Id.* at 103. Parties may not "evade the

requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). Derivative tort claims have the potential to undermine "the central role of arbitration in our 'system of industrial self-government.'" *Id.* at 219 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960)).

In *Allis-Chalmers*, the Court held that section 301 preempted a state-law tort action for bad faith delay in making disability benefit payments under a collective bargaining agreement. The Wisconsin Supreme Court had reasoned that the tort was "independent" of the contract because the duty of good faith was implied in every contract and not derived from an explicit contractual provision. *Allis-Chalmers*, 471 U.S. at 216. The Court rejected this reasoning, explaining that "the tort exists for breach of a 'duty [devolved] upon the insurer by reasonable implication from the express terms of the contract,' the scope of which, crucially, is 'ascertained from a consideration of the contract itself.'" *Id.* (quoting *Hilker v. Western Automobile Ins. Co.*, 235 N.W. 413, 414-15 (Wis. 1931)). Notably, the Court strongly suggested that a different result would obtain where state-law obligations were independent and nonnegotiable. *Id.* at 213 & n.8, 217 n.11; *see also id.* at 211 ("[N]ot every dispute . . . tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301.").

The Court followed this suggestion three years later in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988), holding that section 301 did not preempt the Illinois tort of retaliatory discharge for filing a worker's compensation claim:

> To show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in

4

> discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights. Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective bargaining agreement. To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge; this purely factual inquiry likewise does not turn on the meaning of any provision of a collective bargaining agreement.

*Id.* at 407 (quotation marks and citations omitted). The Seventh Circuit had concluded that section 301 compelled preemption because a state court considering the retaliatory discharge claim "would be deciding precisely *the same issue* as would an arbitrator: whether there was 'just cause' under the contract to discharge the worker." *Id.* at 408 (quoting the court of appeals opinion). The Supreme Court explicitly rejected this reasoning and conclusion, explaining that "as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Id.* at 409.

Dorado's tortious interference claims against Lincoln can be resolved without interpreting any of the negotiated terms of the collective bargaining agreement. Although the Illinois Supreme Court "has never explicitly set out the elements of the tort of intentional interference with existing contract rights," the elements of the tort are generally recognized to be:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) (internal quotation marks omitted). "[W]here the conduct of a defendant in an interference with contract

5

action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious." *Id.* at 677. As the management company for the building, Lincoln had a presumptive privilege to intercede in matters affecting the building's tenants. *Cf. id.* (holding that hospital management company had a privilege to interfere with hospital contracts).

As to the first element, a court need not interpret any specific provisions of a contract in order to establish the mere fact that a contract existed. A claim of retaliatory discharge similarly depends on the prior existence of an employment relationship between the plaintiff and defendant, but the Supreme Court in *Lingle* rejected the view that this type of dependence generates section 301 preemption. *See Dougherty v. Parsec, Inc.*, 872 F.2d 766, 770 n.4 (6th Cir. 1989); *see also Allis-Chalmers*, 486 U.S. at 211 ("not every dispute . . . tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301"). Dorado is free and clear on the first element. Demonstrating Lincoln's awareness of the contractual relation likewise will not require interpretation of the contract.

The third and fourth elements require "unjustified" or "wrongful" conduct on the part of the defendant. Dorado's allegations of impropriety are grounded in state and federal anti-discrimination law and policy, not in any duty derived from the collective bargaining agreement. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 991 (9th Cir. 2001) (holding that section 301 did not preempt tortious interference claims where those claims were "predicated on . . . alleged violations of [state] law," which could "be litigated without reference to the rights and duties established in a [collective bargaining agreement]"); *Dougherty*, 872 F.2d at 766 (holding that section 301 did not preempt tortious interference claim alleging retaliatory motive).

While scores of Illinois court decisions describe the tort as requiring a "breach of contract," *see, e.g., HPI Health Care*, 545 N.E.2d at 676, the Illinois Supreme Court has explained that even a contractually justified termination, if wrongfully induced, may suffice. *See Loewenthal Securities Co. v. White Paving Co.*, 184 N.E. 310, 315 (Ill. 1932) ("To support such a cause of action it is necessary to establish that an outsider has 'maliciously' and 'without lawful cause or justification' induced a breach of contract or an interference with or termination of a recognized contractual relation."); *George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) (recognizing that "either a breach of contract, termination of the contractual relations, or rendering performance impossible" suffices under Illinois law). Dorado can obviously establish termination without pointing to any contractual provisions. But even assuming that a technical breach of contract is required under Illinois law, Dorado can meet this requirement without relying on the negotiated terms of the union contract. Dorado alleges not that Aargus violated any of the express terms of the agreement, but rather that Aargus violated duties derived from federal anti-discrimination law. *Cf. Lincoln Towers Ins. Agency, Inc. v. Boozell*, 684 N.E.2d 900, 904 (Ill. App. Ct. 1997) ("[S]tatutes are a source of implied contract terms which are read into all contracts."). The duty not to discriminate, like the duty not to discharge for a retaliatory motive, is nonnegotiable, nonwaivable, and independent from the language of an employment contract.[2]

Lincoln's reliance on *Kimbro v. Pepsico, Inc.*, 215 F.3d 723 (7th Cir. 2000), is misplaced. There, the plaintiff alleged that a third party, upset because a shipment was delayed, tortiously

---

[2]That the collective bargaining agreement may contain its own anti-discrimination provisions does not make Dorado's claim dependent in any way on those provisions.

7

interfered with his entitlement under a collective bargaining agreement not to be fired for a minor, first-time transgression—*viz.*, violating the third party's "no grazing" rule by eating a stale cookie without paying for it. *Id.* at 725. The Seventh Circuit held that section 301 preempted this claim because "the trier of fact would have had to decide whether [the plaintiff] had a contractual right not to be fired for 'grazing' . . ., an issue that depends on whether grazing is good cause for termination, within the meaning of the contract." In contrast, whether or not asking for the loan was good cause for termination, Aargus breached statutory (and contractual) duties if its actual motive was unlawful retaliation. As in *Lingle*, this "purely factual question pertains to the . . . conduct and motivation of the employer," and does not require "a court to interpret any term of a collective bargaining agreement." 486 U.S. at 407 (citations omitted). *Lingle*, not *Kimbro*, controls.

If more were needed, and this court does not believe that it is, there is a solid argument that Dorado need not show even the *existence* of a contract (let alone a breach thereof). Unlike the plaintiff in *Kimbro*, Dorado has alleged tortious interference with prospective business advantage:

> Under Illinois law, to prevail on a claim of tortious interference with prospective economic advantage, a plaintiff must prove: (1) a reasonable expectation of entering into (or continuing) a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.

*Ocean Atl. Chi. Corp. v. Konicek*, 2001 U.S. Dist. LEXIS 4698, at *14-15 (N.D. Ill. Mar. 6, 2001). As with the pre-existing contract version of the tort, Dorado must additionally allege that

8

Lincoln's actions were "unjustified or malicious." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991).

The section 301 preemption question becomes whether Dorado can establish these elements without recourse to the labor contract. He can. First, Dorado alleges that he "had a reasonable expectation of continued employment." (Compl. ¶¶ 10, 44.) In support of this conclusion, he cites the existence of the union contract but also points out that he had been employed for over nine years, held the same supervisory position throughout this period, was posted at the front desk, and was universally liked by the tenants for the building. (*Id.* ¶¶ 10, 11.) Quite apart from the contract, Dorado has alleged sufficient facts to support a reasonable expectation "of continuing" a business relationship. *Ocean Atl.*, 2001 U.S. Dist. LEXIS 4698, at *15. Whether or not asking for the loan was good cause for termination under the contract, Dorado may still be able to show that he reasonably believed that Aargus would not have terminated him on this ground (absent its improper retaliatory motive). *See Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998) (holding that employee may have a reasonable expectation sufficient to establish tortious interference claim based on current employment, even though that employment is terminable at will). Second, Dorado alleges that Lincoln's agent, Green, worked at the building and observed him since at least August 1997. (Compl. ¶¶ 13, 14, 23.) That, combined with the allegation that Green asked Aargus to fire Dorado (*id.* ¶ 34), is sufficient to support the conclusion that Lincoln knew of Dorado's expectation to continue his employment. Interference and damages are likewise sufficiently pled with no reliance on any particular contractual terms. Finally, impropriety ultimately derives from statute, not from the express terms of the contract.

## B. Illinois Human Rights Act

Dorado has not reached the open sea just yet. Lincoln convincingly argues that Dorado's exclusive state-law remedy arises under the Illinois Human Rights Act (the "IHRA"), 775 ILCS 5/1-101 to 10-103 (West 2001), and can be pursued only through the procedures outlined therein.[3]

The IHRA provides for judicial review of Human Rights Commission orders, *id.* 5/8-111(A), and stipulates that, "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." *Id.* 5/8-111(C). Interpreting this provision and the associated legislative history, the Illinois Supreme Court has held that the IHRA is "the exclusive source for redress of alleged human rights violations." *Mein v. Masonite Corp.*, 485 N.E.2d 312, 315 (Ill. 1985). That court clarified the preemptive scope of the IHRA in *Geise v. Phoenix Co.*, 639 N.E.2d 1273, 1277 (Ill. 1994), holding that tort claims against an employer for negligent hiring and retention were barred because they could not stand "[a]bsent the allegations of sexual harassment" by the employee. Sexual harassment, which was the only basis for negligence alleged in *Geise*, is a prohibited form of employment discrimination under the IHRA. 775 ILCS 5/2-102(D). The Illinois Appellate Court has consistently applied section 8-111(C) to bar tortious interference claims grounded in unlawful discrimination. *Welch v. Ill. Supreme Court*, 751 N.E.2d 1187, 1197 (Ill. App. Ct. 2001); *Faulkner-King v. Wicks*, 590 N.E.2d 511, 517 (Ill. App. Ct. 1992); *Anderson v. Pistner*,

---

[3]Although Lincoln raised this argument for the first time in its reply brief, the court allowed additional briefing and the parties addressed the relevant issues in their surreply and surrebuttal. No point would be served in requiring Lincoln to file a new motion to dismiss on this ground.

10

499 N.E.2d 566, 568-69 (Ill. App. Ct. 1986); *see also Bowers v. Radiological Soc'y of N. Am. Inc.*, 57 F. Supp. 2d 594, 600 (N.D. Ill. 1999) (holding that the IHRA barred a tortious interference claim alleging sexual harassment); *cf. Compton v. Chinn Enters.*, 936 F. Supp. 480, (N.D. Ill. 1996) (explaining that a tort claim is not barred by the IHRA if its elements can be established without showing a "civil rights violation"). This court may not exercise supplemental jurisdiction over a state-law claim if an Illinois court would not have jurisdiction. *Id.* at 483.

The critical question is whether Dorado's tortious interference claims can stand without relying on allegations that constitute an IHRA violation. As explained above, Illinois law requires improper conduct to sustain either of Dorado's tortious interference claims. *See Fellhauer*, 568 N.E.2d at 878; *HPI Health Care*, 545 N.E.2d at 676. The complaint does not directly explain why Lincoln's actions were "unjustified."[4] (Compl. ¶ 46.) But the complaint as a whole can only be read to allege that Green (and therefore Lincoln) was motivated by a desire to retaliate (or at least to assist Aargus in retaliating) for Dorado's prior complaints of racial and disability discrimination. *Cf. Restatement (Second) of Torts* § 767 cmt.c (1981) ("Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper."). By framing his complaint in these terms, Dorado has steered into the IHRA's pull.

---

[4]Although the court expresses no opinion on the matter, this bare allegation, standing alone, may have been sufficient to state a claim. *See Parks v. Female Health Care Associates, Ltd.*, No. 96 C 7133, 1997 U.S. Dist. LEXIS 7426, at *19-20 (N.D. Ill. May 22, 1997). Dorado may not have had to explain why Lincoln's actions were unjustified, but he must live with the consequences of having done so. *Cf. Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 802 (7th Cir. 2000) (plaintiff "pleaded himself out of court by including allegations that establish his inability to state a claim for relief").

11

The IHRA provides that "[i]t is a civil rights violation for a person . . . to . . . [r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." 775 ILCS 5/6-101(A). It is also a violation to "[a]id, abet, compel or coerce a person to commit any violation of this Act." *Id.* 5/6-101(B). "Unlawful discrimination," in turn, is defined to include discrimination both because of "race" and "handicap." *Id.* 5/1-103(Q). "'Handicap' means a determinable physical or mental characteristic of a person . . ., which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic [for purposes of the article covering employment] is unrelated to the person's ability to perform the duties of a particular job or position . . . ." *Id.* 5/1-103(I)(1).

As a preliminary matter, this court believes that Lincoln is a "person" for purposes of section 6-101. The IHRA specifically defines "person" to include corporations. *Id.* 5/1-103(L). The statutory structure supports a broad interpretation of "person." The IHRA is divided into six substantive articles, which cover, respectively, employment, real estate transactions, financial credit, public accommodations, higher education, and additional violations. Section 6-101 appears in the last of these articles, not in the article covering employment (as one would expect if it were meant to be limited to the employment context).

The cases cited by Dorado do not support his assertion that "person" covers only employers. In *Dana Tank Container, Inc. v. Human Rights Comm'n*, 687 N.E.2d 102, 103-04 (Ill. App. Ct. 1997), the court expressly rejected the argument that "person" under section 6-101(A) covers only a statutorily defined "employer." It is true, as Dorado points out, that the holding of the case was that an employer with fewer than 15 employees qualified as a "person," but the rationale makes no distinction between a non-statutory employer and a third-party non-

employer. *See id.* at 104 (section 6-101(A) says "person," not "employer"; "Where the legislature uses certain words in one instance and different words in another, it intended different results."). *Anderson v. Modern Metal Prods.*, 711 N.E.2d 464 (Ill. App. Ct. 1999), held that where retaliatory action is undertaken by a supervisor in the name of the employer, the claim lies against the employer, not against the supervisor individually. *Id.* at 471 (citing *In re Binghay & Clemons*, No. 1991CN2356, 1994 ILHUM LEXIS 608 (Ill. Human Rights Comm'n May 27, 1994). The opinion does explain this holding, but the Human Rights Commission decision it cites states that "the Legislature has made individuals who act for employers personally liable only in limited circumstances." 1994 ILHUM LEXIS 608, at *2. Dorado has not sued Green in a personal capacity, so *Anderson* is not applicable. Finally, the fact that Illinois courts require a plaintiff to show that his or her employer committed an adverse act against the plaintiff in order to sustain a retaliation claim against the employer, *Stone v. Dep't of Human Rights*, 700 N.E.2d 1105, 1112 (Ill. App. Ct. 1998), says nothing about the requirements when the alleged retaliator is not the plaintiff's employer.

But even if, as Dorado urges, Illinois courts would adopt a narrow definition of "person" for purposes of a retaliation claim, Dorado's allegations support the view that Lincoln (through its agent, Green) aided and abetted Aargus's retaliation violation. *See* 775 ILCS 5/6-101(B); *see also Anderson v. Pistner*, 499 N.E.2d 566, 569 (Ill. App. Ct. 1986) ("To the extent that defendants may have aided, abetted, compelled or coerced Montgomery Ward, plaintiffs' employer, to discriminate against them on account of their age, they could have been liable to plaintiffs under the Human Rights Act for committing a civil rights violation."). After all,

13

Lincoln allegedly encouraged Aargus to fire Dorado and provided Aargus with the pretext it used to do so.

Dorado's allegation that Lincoln discriminated against him because of his interracial relationship constitutes prohibited racial discrimination under the IHRA. No Illinois court has squarely addressed this issue, but a bevy of federal courts have expressly held that this type of discrimination is prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-1 to e-17 (West 1994). *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 588-89 (5th Cir. 1998), *reinstated en banc in relevant part*, 182 F.3d 333 (5th Cir. 1999) (per curiam); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986); *Monley v. Q Int'l Courier, Inc.*, 128 F. Supp. 2d 1155, 1159-60 (N.D. Ill. 2001); *see also Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992) (affirming a Title VII judgment in favor of a white woman who alleged discrimination based on her interracial marriage). The relevant statutory language is identical, *compare* 775 ILCS 5/1-103(Q) ("because of his or her race"), *with* 42 U.S.C.A. § 2000e-2(a) ("because of such individual's race"), and Illinois courts routinely consult and rely upon Title VII case law when determining whether discrimination violates Illinois law. *Pioneer Life Ins. Co. v. Woodard*, 504 N.E.2d 230, 234 (Ill. App. Ct. 1987). This court is confident that the Illinois Supreme Court would hold that the IHRA prohibits discrimination based on an interracial relationship.

Retaliation against Dorado for complaining about this type of discrimination therefore constitutes a violation of the IHRA. Allegations of impropriety derived from this violation cannot be used to support Dorado's claims for tortious interference. Without his racial sail, the

14

fate of Dorado's tort claims depends on whether the alleged disability discrimination was also "unlawful discrimination" under the IHRA. If it was, then retaliation for complaining about this discrimination also violated the IHRA and for that reason cannot be relied upon to support independent tort claims.

Dorado's irregular heartbeat, acute partial and then total kidney failure, which resulted in five weeks of hospitalization, was a "determinable physical" characteristic. *Cf. Kenall Mfg. Co. v. Human Rights Comm'n*, 504 N.E.2d 805, 810 (Ill. App. Ct. 1987) (finding "handicap" based on "history of heart disease as evidenced by his heart attack and six months' disability leave of absence"). One might contend that Dorado's condition was nonetheless not a "handicap" because it was related to his ability to perform the duties of his job. *See* 775 ILCS 5/1-103(I)(1). Dorado alleges that he, "particularly with his medical condition, could not physically endure a nine hour shift without using the washroom or eating." (Compl. ¶ 22.) But the complaint alleges that the no-breaks policy was a new job requirement, itself a component of the discrimination. (*Id.* ¶ 20.) Employers would have an easy escape hatch from discrimination claims if they were free to add new duties that they know an employee will not be able to perform because of his or her handicap. This is perhaps why Illinois courts sensibly require an employee mounting a handicap discrimination claim to show "that his handicap is unrelated to his ability to perform the functions *of the job he was hired to perform*." *Cisco Trucking Co. v. Human Rights Comm'n*, 653 N.E.2d 986, 988 (Ill. App. Ct. 1995) (emphasis added). Applying this test, it seems clear that Dorado's condition qualified as a "handicap" under the IHRA. Again, the IHRA prohibits retaliation for having complained about discrimination on this basis. Absent the race, disability,

and derivative retaliation allegations, Dorado's tortious interference claims (on this complaint) are sunk.[5]

### III. Conclusion

For the reasons outlined above, this court dismisses Dorado's claims against Lincoln as barred by the IHRA. Dismissal is, however, without prejudice. Dorado is free to allege, if he can, that he has already met the requirements of the IHRA. Alternatively, Dorado may be able to amend his complaint to allege, or at least to admit of the possibility, that Lincoln's actions were improper for a reason wholly independent of the IHRA (and the collective bargaining agreement). Should Dorado wish to file an amended complaint, he may do so within 30 days. If no amended complaint is filed, this dismissal will be with prejudice.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: February 13, 2002

---

[5]That Aargus may have violated federal law, without more, cannot establish that Lincoln's actions were wrongful for purposes of a state-law tort. On the other hand, although the court expresses no opinion on the matter, Dorado might have been able to assert an independent federal cause of action against Lincoln, despite the fact that Aargus did the actual firing. *See Bampoe v. Coach Stores, Inc.*, 93 F. Supp. 2d 360, 369-70 (S.D.N.Y. 2000) (holding that retailer where security guard worked was an "employer" for purposes of Title VII, even though the guard was paid by the retailer's security contractor). *But cf. Hale v. Marsh*, 808 F.2d 616 (7th Cir. 1986) (declining to extend Title VII liability to a third-party non-employer).